**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | |
|---|---|
| RONALD SCOTT HANGEY AND ROSEMARY HANGEY H/W, | : No. 14 EAP 2022 |
| | : |
| | : Appeal from the Judgment of |
| Appellees | : Superior Court entered on March 8, |
| | : 2021, at No. 3298 EDA 2017 |
| | : reversing the Order entered on |
| v. | : September 7, 2017, in the Court of |
| | : Common Pleas, Philadelphia |
| | : County, Civil Division at No. 1015 |
| HUSQVARNA PROFESSIONAL | : March Term, 2017. |
| PRODUCTS, INC., HUSQVARNA GROUP, | : |
| HUSQVARNA U.S. HOLDING, INC., | : ARGUED: March 8, 2023 |
| HUSQVARNA AB, AND TRUMBAUER'S | : |
| LAWN AND RECREATION, INC., | : |
| | : |
| Appellants | : |

**OPINION**

**JUSTICE DOUGHERTY**                    **DECIDED: NOVEMBER 22, 2023**

In this case, the trial court transferred venue based on a determination the corporate defendant did not regularly conduct business in Philadelphia County because only 0.005% of the company's total national revenue was derived from that county. On appeal, the Superior Court reversed, holding the trial court abused its discretion in transferring venue. We granted discretionary review to evaluate the Superior Court's determination, and now affirm. For the reasons that follow, we hold venue properly lies in Philadelphia County.

## I. Factual and Procedural Background

Appellees, Ronald and Rosemary Hangey ("the Hangeys"), commenced this action on March 10, 2017, filing a civil complaint in the Court of Common Pleas of Philadelphia County against defendants Husqvarna Professional Products, Inc. ("HPP"), Husqvarna Group, and Trumbauer's Lawn and Recreation, Inc. (collectively, "appellants"). HPP filed preliminary objections, arguing, *inter alia*, venue was improper in Philadelphia County. *See* HPP's Prelim. Objections, 3/30/17 at 3. On April 10, 2017, the Hangeys filed an amended complaint, adding two more defendants, Husqvarna U.S. Holding, Inc., and Husqvarna AB.

The amended complaint raised claims sounding in negligence, strict liability, and loss of consortium, and it alleged the following facts: On or about May 16, 2013, Mr. Hangey purchased a Husqvarna riding lawnmower from Trumbauer's in Bucks County. On or about August 5, 2016, Mr. Hangey was operating the lawnmower on his property in Wayne County when he was thrown off the mower. The mower proceeded to roll over Mr. Hangey's legs while its blades continued to move at a high speed. Mr. Hangey suffered severe and catastrophic injuries to both of his legs. According to the amended complaint, the lawnmower was defective and unreasonably dangerous because it lacked appropriate safety features, and the Hangeys sought damages from appellants. *See* Am. Compl., 4/10/17 at 5-6.

HPP and Trumbauer each filed preliminary objections to the amended complaint, again challenging venue in Philadelphia County pursuant to Pennsylvania Rule of Civil Procedure 2179(a), which lists the criteria for where venue is proper against a corporation. *See* HPP's Prelim. Objections, 5/1/2017 at 6-8; Trumbauer's Prelim. Objections, 5/1/2017 at 6-8. Rule 2179(a) provides:

> **(a) General Rule.** Except as otherwise provided by an Act of Assembly or by subdivision (b) of this rule, a personal action against a corporation or similar entity may be brought in and only in a county where

(1) the registered office or principal place of business of the corporation or similar entity is located;
(2) the corporation or similar entity regularly conducts business;
(3) the cause of action arose;
(4) a transaction or occurrence took place out of which the cause of action arose; or
(5) the property or a part of the property, which is the subject matter of the action, is located provided that equitable relief is sought with respect to the property.

Pa.R.C.P. 2179(a). Focusing on subsection (a)(2), appellants argued neither of them regularly conducted business in Philadelphia County because neither was registered to do business in the county, utilized any warehouses or other facilities there, had any addresses or telephone numbers there, owned any real property there, had any employees or officers based there or residing there, or had entered into any contracts with either Philadelphia County or the City of Philadelphia.[1] *See* HPP's Memorandum in Support of Prelim. Objections, 5/1/2017 at 9; Trumbauer's Memorandum in Support of Prelim. Objections, 5/1/2017 at 9. Appellants requested the trial court transfer the case to Wayne County but acknowledged venue may also lie in Bucks and Montgomery Counties. Husqvarna U.S. Holding, Inc. and Husqvarna AB also filed preliminary objections, challenging personal jurisdiction. *See* Husqvarna U.S. Holding, Inc. Prelim. Objections, 5/8/2017 at 7-8; Husqvarna AB Prelim. Objections, 7/5/2017 at 5-6. The trial court allowed the parties to conduct discovery relevant to venue and personal jurisdiction, and after hearing oral argument on those issues on September 6, 2017, it dismissed defendants Husqvarna U.S. Holding, Inc. and Husqvarna AB for lack of personal jurisdiction. The trial court transferred the case against the remaining defendants to Bucks County, holding venue improper in Philadelphia County. The Hangeys appealed, challenging the venue determination only.

---

[1] "Philadelphia County is coterminous with the City of Philadelphia[.]" *Mount Airy #1, LLC v. Pa. Dep't of Rev. & Eileen McNulty*, 154 A.3d 268, 271 (Pa. 2016).

In its Rule 1925(a) opinion, the trial court initially recited the facts revealed through the venue-related discovery. It explained defendant Husqvarna Group is a nonexistent entity used as a marketing device for a number of Husqvarna-branded corporate entities, including HPP. *See Hangey v. Husqvarna Prof'l Prods., Inc.*, No. 17031015, slip op. at 2 (C.P. Phila., Mar. 2, 2018) ("Trial Court Op."), *citing* John Stanfield Dep., 8/30/17 at 55-56. Trumbauer attached to its preliminary objections the affidavit of John Trumbauer, its sole shareholder, in which he averred Trumbauer's principal place of business was in Quakertown, Bucks County; Philadelphia did not fall within Trumbauer's target market area; and it did not regularly conduct business in Philadelphia. *See id.*, *citing* John Trumbauer Aff. HPP is a Delaware Corporation with a principal place of business in Charlotte, North Carolina. *See id.*, *citing* Jordan Baucom Aff. In 2016, HPP made approximately $1.4 billion in sales revenue throughout the United States, of which $75,310 came from direct sales in Philadelphia County, amounting to about 0.005% of HPP's United States sales revenue in 2016. *See id.* Of those sales, about $69,700 came from DL Electronics, Inc., a Husqvarna authorized dealer. *See id.*; *see also Hangey v. Husqvarna Prof'l Prods., Inc.*, 247 A.3d 1136, 1139 (Pa. Super. 2021) (*en banc*). Sales data from 2014 and 2015 is substantially similar, as approximately 0.005% of HPP's United States sales revenue for those years also came from direct sales in Philadelphia County. *See* Trial Court Op. at 2. Those revenue figures do not include revenue from sales of HPP products at "big box" retailers like Lowe's, Home Depot, or Sears. *See id.* at 3. According to John Stanfield, HPP's corporate representative deposed during discovery, HPP generally delivers its products to the big box retailers' distribution centers, none of which are in Philadelphia County. *See id.*, *citing* Stanfield Dep. at 31-34. Once HPP's products are delivered to those distribution centers, the retailers alone decide

where the products will be offered for sale (including stores located in Philadelphia County). *See id.*, *citing* Stanfield Aff. at 19.[2]

Addressing venue, the trial court explained it must be challenged by preliminary objection, and the defendant bears the burden of proving improper venue. *See id.* The court explained Rule 2179 provides five scenarios in which venue will be proper against a corporate entity, but here, the only question is whether HPP regularly conducts business in Philadelphia County under Rule 2179(a)(2). Pursuant to Pennsylvania Rule of Civil Procedure 1006(c), "[a]n action to enforce a joint or joint and several liability against two or more defendants . . . may be brought against all defendants in any county in which the venue may be laid against any one of the defendants . . . ." Pa.R.C.P. 1006(c). Thus, the court explained, "venue is proper in any county in which venue is proper as to any defendant[.]" Trial Court Op. at 4.[3]

The trial court recognized under this Court's decision in *Purcell v. Bryn Mawr Hosp.*, 579 A.2d 1282 (Pa. 1990), courts must perform a "quality-quantity" analysis, that is, evaluate both the quality and quantity of acts performed by a corporation in the county to determine if it is regularly conducting business there for purposes of Rule 2179(a)(2). *See id.* In *Purcell*, the Court explained "'[q]uality of acts' means 'those directly, furthering or essential to, corporate objects; they do not include incidental acts.' Quantity means

---

[2] Although not mentioned by the trial court, discovery revealed HPP maintains separate contracts with its authorized dealers. *See* Stanfield Dep. at 108. The record also includes photographs of Husqvarna products that, according to the Hangeys, were taken at S&H Hardware, another authorized dealer in Philadelphia County. *See* Exs. D & E to Plaintiffs' Jurisdictional Interrogs. When asked about the products in these photos, John Stanfield testified, "I would have to assume that if they're at S&H Hardware that [they were] distributed by [HPP]." Stanfield Dep. at 82.

[3] The Hangeys did not argue Husqvarna Group or Trumbauer independently satisfied the venue requirements in Rule 2179; so long as venue could be laid against HPP in Philadelphia County, venue was proper as to the other defendants pursuant to Rule 1006(c).

those acts which are 'so continuous and sufficient to be general or habitual.'" 579 A.2d at 1285, *quoting Shambe v. Delaware & Hudson R.R. Co.*, 135 A. 755, 757 (Pa. 1927).

Applying this test to HPP's acts in Philadelphia County, the trial court first determined "there is no question [HPP's] activities in Philadelphia satisfy the 'quality' prong of the *Purcell* analysis." Trial Court Op. at 5. It explained HPP is in the business of distributing consumer outdoor products (*e.g.*, lawnmowers) to retailers, who then sell the products to consumers.[4] Because uncontested evidence shows HPP furthers this business objective by distributing products to two Philadelphia retailers, the trial court reasoned its activities satisfied the quality prong. *See id.*

The court held venue improper, however, because it found HPP's activities in Philadelphia County did not satisfy the quantity prong. The trial court recognized our directives in *Purcell* that "[a] single act is not enough," and "each case must depend on its own facts." *Id.*, *quoting Purcell*, 579 A.2d at 1285. It then looked for guidance from *Canter v. American Honda Motor Corp.*, 231 A.2d 140 (Pa. 1967), where this Court held the trial court had not abused its discretion when it found venue was proper in Philadelphia County where one to two percent of the defendant's total business was consummated in Philadelphia. *See id.* at 5-6, *citing Canter*, 231 A.2d at 143. Here, the court reasoned, the evidence showed in 2016, only $75,310 out of HPP's $1.393 billion in national revenue came from direct sales in Philadelphia County, or about 0.005%. *See id.* at 6. The data from 2014 and 2015 is similar. The trial court therefore held "[t]his *de minimis* amount of business, 1/100th of the amount found sufficient in *Canter*, is not general and habitual." *Id.* In comparison, the court noted, HPP's direct sales within Bucks County comprised approximately 0.2% of HPP's revenue in 2016. *See id.*, *citing* Stanfield Aff. at ¶22. The court also calculated that if HPP's business were distributed evenly among the

---

[4] HPP does not manufacture the products it sells. *See* Trial Court Op. at 5 n.1.

3,141 counties in the United States, HPP would do 0.031% of its business in Philadelphia County; its actual business from 2014-2016 was only one-sixth of that amount. *See id.* at 6 n.2.[5] Thus, the trial court held HPP's activities in Philadelphia County failed the quantity prong, and it transferred the case to Bucks County. *See id.* at 6, 8.

In an unpublished decision, a divided three-judge panel of the Superior Court reversed.[6] Appellants applied for reargument *en banc.* The Superior Court granted the application and withdrew the panel's opinion. The parties filed new briefs,[7] and an *en*

---

[5] The trial court also rejected the Hangeys' argument the court should consider the value of HPP merchandise sold in Philadelphia by the "big box" retailers. It reasoned the products sold to the big box retailers are delivered to their distribution centers outside of Philadelphia County, and it is the retailers who determine how much HPP product (if any) is sold in stores located in Philadelphia County. It therefore found the big box retailers are the ones selling the products within the county, not HPP. The court further distinguished *Kitzinger v. Gimbel Bros., Inc.*, 368 A.2d 333 (Pa. Super. 1976), a case where the Superior Court held Pennsylvania courts had personal jurisdiction over a Hong Kong corporation that sold products to Gimbels because the Hong Kong corporation knew the goods were intended for use in Pennsylvania. *See* Trial Court Op. at 7. By contrast here, the court reasoned, HPP did not know where its products would go after it delivered the products to the big box retailers' distribution centers. *See id.*

[6] The majority opinion held the trial court abused its discretion in finding venue improper in Philadelphia County. The panel majority reasoned the trial court erred because it relied "almost exclusively" on the percentage of HPP's business occurring in Philadelphia County when addressing the quantity prong. *See Hangey v. Husqvarna Prof'l Prods., Inc.*, 3298 EDA 2017, slip op. at 9-10 (Pa. Super., Apr. 1, 2019) (unpublished memorandum) (withdrawn). It found venue was in fact proper in Philadelphia County because HPP's contacts with the county, which included selling $75,310 in products in 2016, most of which was through an authorized dealer in Philadelphia, met the quantity prong's requirements. *See id.* at 10. Judge Olson dissented, relying primarily on the deferential standard of review. *See Hangey v. Husqvarna Prof'l Prods., Inc.*, 3298 EDA 2017, slip op. at 1-2 (Pa. Super. Apr. 1, 2019) (Olson, J., dissenting) ("[i]f there exists any proper basis for the trial court's decision to grant the petition to transfer venue, the decision must stand"), *quoting Krosnowski v. Ward*, 836 A.2d 143, 146 (Pa. Super. 2003) (*en banc*).

[7] In addition to considering the issue raised by the Hangeys ("Did the trial court err as a matter of law, and thereby abuse its discretion, in holding that [HPP] does not regularly conduct business in Philadelphia County, merely because the overwhelming majority of its sales in the United States have occurred elsewhere, thereby overlooking the (continued…)

*banc* panel of the Superior Court heard oral arguments. On March 8, 2021, the *en banc* panel filed a precedential opinion reversing the order of the trial court. Writing for the majority,[8] Judge McLaughlin began by outlining the standard of review:

> We review an order granting or denying preliminary objections asserting improper venue for abuse of discretion. *Zampana-Barry v. Donaghue*, 921 A.2d 500, 503 (Pa. Super. 2007). "A [p]laintiff's choice of forum is to be given great weight, and the burden is on the party challenging the choice to show it was improper." *Fritz v. Glen Mills Schools*, 840 A.2d 1021, 1023 (Pa. Super. 2003) . . . . "However, a plaintiff's choice of venue is not absolute or unassailable." *Id.* . . . "[I]f there exists any proper basis for the trial court's decision to grant the petition to transfer venue, the decision must stand." *Krosnowski v. Ward*, 836 A.2d 143, 146 (Pa. Super. 2003) (en banc) . . . .

*Hangey*, 247 A.3d at 1140 (some citations omitted).

The court explained its inquiry focused on whether HPP "regularly conducts business" for purposes of Rule 2179(a)(2). *Id.* at 1141. It emphasized that when the court is determining whether venue is proper in a particular county, "each case rests on its own facts," *id.* at 1141, *quoting Purcell*, 579 A.2d at 1286, and explained "[t]he question is whether the acts are being 'regularly' performed within the context of the particular business[,]" *id.*, *quoting Monaco v. Montgomery Cab Co.*, 208 A.2d 252, 256 (Pa. 1965). The court elaborated that for venue determinations, "'regularly' does not mean 'principally,' and a defendant 'may perform acts "regularly" even though these acts make up a small part of its total activities.'" *Id.*, *quoting Canter*, 231 A.2d at 142. In explaining the quantity prong of the quality-quantity venue test for Rule 2179(a)(2), the court stated,

---

undisputed continuous, ongoing, and regularly recurring sales of Husqvarna consumer products in Philadelphia County?"), the court ordered the parties to brief an additional issue: "Whether the *en banc* Panel should specifically adopt or overrule prior appellate decisions involving the quantity prong of the venue analysis?" Superior Court Order, 7/9/19.

[8] President Judge Panella and Judges Dubow, Murray, and McCaffery joined the majority opinion. Judges Kunselman and Nichols concurred in the result without opinion.

"[t]o satisfy the quantity prong of this analysis, acts must be 'sufficiently continuous so as to be considered habitual.'" *Id.*, *quoting Zampana-Barry*, 921 A.2d at 504.

The Superior Court then acknowledged "Pennsylvania appellate courts have often considered the percentage of overall business a defendant company conducts in a county to determine if the quantity prong was met." *Id.*, *citing Canter*, 231 A.2d at 143 (quantity prong met where only one to two percent of the defendant's business came from the forum county); *Monaco*, 208 A.2d at 256 (same, where five to ten percent of taxicab company's fares were collected in the forum); *Zampana-Barry*, 921 A.2d at 506 (same, where defendant law firm generated about three to five percent of its gross business revenue from cases in the forum). "However," the Superior Court clarified, "no court has stated that the percentage of a defendant's business is the **sole** evidence relevant to the 'quantity' analysis." *Id.* (emphasis added).

Instead, the court explained, "courts must determine whether all the evidence presented, including the scope of the defendant's business, viewed in the context of the facts of the case, establish that a defendant's contacts with the venue satisfy the quantity prong." *Id.* It then distinguished other Superior Court decisions where a small percentage of business in a county did not satisfy the quantity prong, explaining in those cases, "the [Superior] Court's core finding was that the contacts failed the **quality** prong of the venue test and the cases often addressed defendants who were small and/or local companies, not multi-billion-dollar corporations." *Id.* at 1142 (emphasis in original), *citing Singley v. Flier*, 851 A.2d 200, 202-03 (Pa. Super. 2004); *PECO Energy Co. v. Philadelphia Suburban Water Co.*, 802 A.2d 666, 670 (Pa. Super. 2002); *Battuello v. Camelback Ski Corp.*, 598 A.2d 1027, 1029-30 (Pa. Super. 1991).

Thus, the court concluded the percentage of business standing alone "is not meaningful and is not determinative of the 'quantity' prong[,]" and the courts must look at

all of the evidence in context against the nature of the defendant's business and business activities in the venue. *Id.* at 1142. For instance, it explained, "[a] small or local business may do all of its work in just a few counties or even a single one, while a large business may span the entire nation. Indeed, the percentage of sales a multi-billion-dollar company makes in a particular county will almost always be a tiny percentage of its total sales." *Id.*

Considering the facts of this case, the Superior Court noted HPP is a multi-billion-dollar corporation with at least one authorized dealer in Philadelphia to which it delivered its products for sale. *See id.* It reasoned that even though HPP's sales in Philadelphia accounted for only 0.005% of its national sales, the dollar amount of those sales was $75,310 in 2016. *See id.* Since these facts were relevant to whether HPP's contacts satisfied the "quantity" prong of the Rule 2179(a)(2) analysis, the Superior Court held "the trial court erred in relying almost exclusively on evidence of the percentage of defendant's business that occurred in Philadelphia when addressing the quantity prong." *Id.* at 1143. It further held that "based on the totality of the evidence, HPP's contacts satisfied the quantity prong of the venue test[,]" because "[i]ts contacts with Philadelphia — including having an authorized dealer in Philadelphia, and selling $75,310 worth of products through that dealer in 2016 in Philadelphia — were 'sufficiently continuous so as to be considered habitual.'" *Id.*, *quoting Zampana-Barry*, 921 A.2d at 504.

Judge Stabile filed a dissenting opinion, in which Judge King joined. The dissent highlighted that trial courts have "considerable discretion" to determine the propriety of a particular venue and that an appellate court will not overturn the trial court's decision "so long as it is reasonable in view of the facts." *Id.* (Stabile, J. dissenting) (citations omitted). The dissent reasoned the trial court's finding that 0.005% of HPP's national sales revenue was *de minimis* and therefore failed the quantity prong was reasonable and accorded with applicable Superior Court precedent. *See id.* at 1144, *citing Singley*, 851 A.2d at 203

(rejecting plaintiff's argument the quantity prong was satisfied and venue was properly laid in Philadelphia against Villanova University, whose campus is located in Delaware County, based on the fact Villanova offered three graduate level classes at the Philadelphia Naval Yard); *PECO Energy*, 802 A.2d at 670 (quantity prong unsatisfied where only 0.036% of defendant's water piping system was in Philadelphia and defendant had made a one-time purchase of 300,000 gallons of water from the City of Philadelphia, representing only 0.0007% of its water purchases over ten years); *Battuello*, 598 A.2d at 1028 (quantity prong unsatisfied where the defendant, a Monroe County ski resort, sent brochures and advertised to Philadelphia residents and worked with a tour company that regularly brought Philadelphia residents to its resort, reasoning the business generated by the tour company was "far too small to qualify as 'general or habitual'").

Affording the trial court considerable discretion and considering *Singley*, *PECO Energy*, and *Battuello*, the dissent concluded it could not deem the trial court's decision unreasonable. *See id.* at 1145. The dissent acknowledged cases like *Monaco*, *Canter*, and *Zampana-Barry* have found the quantity prong satisfied where the defendant conducts a comparatively small amount of its total business in the venue. It reasoned, however, those cases did not warrant a finding the trial court here abused its discretion. The dissent suggested the deferential standard of review is likely due to the imprecise standards for conducting a quality-quantity analysis. But "[a] finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion." *Id.*, *quoting Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1123 (Pa. 2000). The dissent believed the majority reversed the trial court simply because it would have reached a different result. It concluded that "[u]nder our existing jurisprudence, . . . trial courts have discretion to assign great weight — **even decisive weight** — to the fact that a defendant conducts a vanishingly small percentage of its

business in the plaintiff's chosen forum." *Id.* at 1146 (emphasis added). The dissent remarked "[i]f five one-thousandths of a percent is sufficient to establish quantity, it is difficult to imagine a percentage that is too small." *Id.*

Appellants petitioned this Court for allowance of appeal. On May 10, 2022, we granted allocatur on the following issues:

> (1) Whether the Superior Court committed legal error when it held that a trial court employing the quality-quantity test for venue abuses its discretion by weighing the totality of the evidence presented and, in the absence of other evidence relevant to the analysis, finding that 0.005 percent of a defendant's total sales occurring in the forum county is *de minimis* and alone insufficient to render venue proper[.]

> (2) Whether the Superior Court failed to faithfully apply the [abuse of discretion] standard of review when it reversed the trial court's decision sustaining Petitioners' preliminary objections for improper venue, in the absence of a finding that the trial court's decision was manifestly unreasonable, that the trial court failed to apply the law, or that the trial court was motivated by partiality, prejudice, bias, or ill-will[.]

*Hangey v. Husqvarna Prof'l Prods., Inc.*, 278 A.3d 301 (Table) (Pa. May 10, 2022).

## II. Relevant Precedent

Because both parties rely heavily on Pennsylvania precedent, it is helpful to review the predominant cases before proceeding. Moving chronologically, we begin by looking at the Court's 1927 opinion in *Shambe*, which involved questions of personal jurisdiction (and venue[9]) over a foreign railroad company for a suit brought in Philadelphia County. *See* 135 A. at 756. The company was registered in Pennsylvania and operated a railroad

---

[9] While *Shambe* speaks in terms of jurisdiction and does not use the word "venue," its analysis touched on points similar to a present-day venue analysis. It explained, "[w]here a foreign corporation is doing business in the state and has complied with the law as to registration, the place where the action is to be instituted in the state is a matter for our Legislature to determine. The due process of the Fourteenth Amendment in this respect does not extend beyond the fact of doing business within the state." *Shambe*, 135 A. at 757. In fact, it noted "[p]laintiff might have brought his action in Luzerne [C]ounty, where the accident happened[.]" *Id.*

in the northeast section of the state, but it did not own tracks or roadbed in Philadelphia County. *See id.* The Court explained the railroad company rented rooms in a Philadelphia office building for ten years, where it displayed the company's logo, used its letterhead and stationery, and had a telephone in the company's name. *See id.* Employees in those offices primarily solicited freight; they did not actually handle any freight, bills of lading, or freight contracts. *See id.*

The *Shambe* Court ultimately held the lawsuit was improperly brought in Philadelphia County under a statute that allowed suit against a foreign corporation in any county where the corporation was "doing business." *Id.* at 757. The Court explained "[t]he essential elements which constitute 'doing business,' as required by our laws, are the same as those necessary under the due-process clause of the federal Constitution." *Id.* It then listed as one of those elements that "the business engaged in must be sufficient in quantity and quality[.]" *Id.* The Court elaborated:

> The term 'quality of acts' means those directly furthering, or essential to, corporate objects; they do not include incidental acts. . . . By 'quantity of acts' is meant those which are so continuous and sufficient to be termed general or habitual. A single act is not enough. . . . Each case must depend on its own facts, and must show that the essential requirement of jurisdiction has been complied with.

*Id.* at 757-58 (citations omitted). The *Shambe* Court ultimately held the railroad company was not "doing business" in Philadelphia County under the quality-quantity test. *See id.* at 758. It reasoned the railroad company's activities were "the mere solicitation of business, [which,] without more, would not be 'doing business.'" *Id.* (quotation and citation omitted).

In 1944, the phrase "regularly conducts business" was first added to our Rules of Civil Procedure with the adoption of Rule 2179(a)(2). *See Monaco*, 208 A.2d at 255. The Court's first case to squarely address the new Rule 2179(a)(2) was *Law v. Atlantic Coast Line Railroad Co.*, 79 A.2d 252 (Pa. 1951), which involved facts substantially analogous

to those of *Shambe*: a foreign railroad company did not own or operate any railroad line, station, terminal, yard shop, or other transportation facilities in Pennsylvania, but had cars that traveled through Philadelphia and maintained passenger and freight offices for the purpose of soliciting business. Although the new "regularly conducts business" text was in effect under Rule 2179(a)(2), and the Court cited that rule, *Law* did not quote the new language. Instead, observing the facts were "almost identical" to those in *Shambe* and a United States Supreme Court case, *Green v. Chicago, Burlington, and Quincy Railway Co.*, 205 U.S. 530 (1907), the *Law* Court explained both decisions "held that the defendant could not be served within the County **or State** in question since it was not 'doing business' therein." *Law,* 79 A.2d at 254 (emphasis partially omitted). The Court reiterated the quality-quantity test and ultimately held it was bound by *Shambe*. *See id.* at 255. Thus, it seems the *Law* Court addressed venue together with jurisdictional questions, and it did so by simply adopting *Shambe*'s analysis under the former "doing business" standard.[10]

Then, in *Monaco*, decided in 1965, the Court explicitly applied the *Shambe* quality-quantity test to determine whether a corporation "regularly conducts business" for purposes of a Pennsylvania venue analysis under Rule 2179(a)(2). *See* 208 A.2d at 256. The defendant in *Monaco* was a taxicab business sued in Philadelphia County. *See id.* Pursuant to its certificate from the Public Utility Commission, the taxicab company was prohibited from picking up passengers in Philadelphia County, but it was allowed to pick them up in Montgomery County and take them to Philadelphia County. *See id.* Between five and ten percent of the company's gross business derived from those rides that began

---

[10] In fact, the *Law* Court framed the question as "whether [the railroad] was 'doing business' within the meaning of our decisions concerning service of process, and whether to sustain this suit would constitute an unreasonable burden on interstate commerce in violation of Article I, Section 8 of the Constitution of the United States." *Law*, 79 A.2d at 253.

in Montgomery County and ended in Philadelphia County, meaning five to ten percent of its fares were collected in Philadelphia County. *See id.*

The *Monaco* Court reiterated *Shambe*'s teaching that "[e]ach case must depend on its own facts," and explained it would not "overturn a lower court's determination that a corporation was not regularly conducting business in a particular county when such conclusion [was] a reasonable one in view of the facts." *Id.* Nevertheless, the Court reversed the trial court's venue transfer, holding the taxicab company regularly conducted business under the quality-quantity test. Addressing the quality prong first, the Court explained "[c]learly, the acts of driving into Philadelphia County at the request of customers and collecting fares there were acts directly essential to and in furtherance of corporate objects and, therefore, were of sufficient quality." *Id.* It then found that "[j]ust as clearly, the acts were performed habitually and, therefore, were of sufficient quantity." *Id.* The Court then cautioned "[i]t must be remembered that it is the word 'regularly' which we are construing and not 'principally.' A corporation may perform acts 'regularly' even [though] these acts make up a small part of its total activities." *Id.* Moreover, we explained, "[n]or does 'regularly' necessarily mean . . . that the acts must be performed on a fixed schedule . . . . The question is whether the acts are being 'regularly' performed within the context of the particular business." *Id.*[11]

Two years later, we decided *Canter*, where a plaintiff brought a product liability suit against Honda in Philadelphia County after he had a motorcycle accident in Montgomery County. *See* 231 A.2d at 141. Honda joined the seller of the motorcycle, Motor Sport,

---

[11] About six months after the Court decided *Monaco*, it further solidified its reliance on *Shambe* for establishing venue under Rule 2179(a) in *Botwinick v. Credit Exchange, Inc.*, where it cited *Shambe* for the proposition that "'[d]oing business' within the state has a dual significance: (a) it is essential to the exercise of any **jurisdiction** by the state over a foreign corporation and (b) it is essential in determining the appropriate **venue** for an action against a foreign corporation." 213 A.2d 349, 352 (Pa. 1965) (emphasis in original).

Inc., as a defendant.  *See id.*  Motor Sport filed preliminary objections challenging venue under Rule 2179, arguing it did not regularly conduct business in Philadelphia County. *See id.*  Honda deposed Motor Sport's general manager and one of its stockholders.  The deposition established the facts that: Motor Sport had business locations in Montgomery and Delaware Counties; it never had a business location in Philadelphia County; the nature of Motor Sport's business was the selling and servicing of new and used automobiles, including motorcycles; and Motor Sport advertised on local radio and in local newspapers in the Philadelphia area.  *See id.*  The deponent estimated about 20% of his total business "came from Philadelphia," but when questioned about actual sales taking place in Philadelphia, he said Motor Sport made some demonstrations of cars in Philadelphia and "perhaps some agreements of sale were signed in Philadelphia."  *Id.* The lower court found Motor Sport's gross sales and service business were $3.7 million in 1964 and $4.1 million in 1965.  *See id.*  However, the deponent stated only "a very minor portion of his business, such as 1 or 2 percent, was consummated in the City of Philadelphia."  *Id.*  The trial court sustained Motor Sport's preliminary objection to venue.

On appeal, this Court held that under *Monaco*, Motor Sport's "business activities as described[] were of sufficient quality, quantity and regularity as to constitute regularly conducting business."  *Id.* at 142-43.  We found "[t]he acts of driving into Philadelphia to demonstrate cars and to consummate sales were acts directly essential to and in furtherance of corporate object[,]" satisfying the quality prong.  *Id.* at 143.  Analyzing the quality prong, we stressed it was the word "regularly" that we were construing, and that "[a] corporation may perform acts 'regularly' even though these acts make up a small part of its total activities."  *Id.*, *quoting Monaco*, 208 A.2d at 256.  We then held "1 to 2 percent of the total business was sufficient to satisfy the test set up in *Monaco* as to quantity."  *Id.* The Court therefore reversed the trial court's order changing venue.  *See id.*

Most recently, in 1990, we addressed Rule 2179(a)(2)'s "regularly conducts business" requirement in *Purcell*. In that case, plaintiffs brought suit in Philadelphia County against Bryn Mawr Hospital, which was located in Montgomery County. *See Purcell*, 579 A.2d at 1283. The hospital filed preliminary objections, seeking a transfer of venue. *See id.* The trial court overruled the objections, holding venue was proper under Rule 2179(a)(2). *See id.* The trial court found the hospital regularly conducted business in Philadelphia County based on the facts it: had contractual affiliations with residency programs of teaching hospitals in Philadelphia; recruited and employed medical residents from those Philadelphia teaching hospitals to work at the hospital in Montgomery County; purchased goods and services from businesses in Philadelphia County; advertised in the Philadelphia County Yellow Pages and White Pages; advertised in the Philadelphia Inquirer; and accepted a portion of its income from residents of Philadelphia County who went to Bryn Mawr Hospital for treatment. *See id.* at 1283-84.

On appeal, this Court reversed, finding venue was improper in Philadelphia County because the hospital did not meet the quality-quantity test.[12] We once again emphasized

---

[12] In doing so, we first rejected the hospital's argument that *Burdett Oxygen Co. v. I.R. Wolfe & Sons, Inc.*, 249 A.2d 299 (Pa. 1969), established a different "substantial relationship" test for evaluating whether a corporation regularly conducts business in a particular county. In *Burdett*, we held venue was proper in Montgomery County, even though the corporation was bound by a contract that barred it from selling in that county. The *Burdett* Court reasoned "[c]onducting business involves more than selling; certainly it cannot be denied that appellant was doing business when it purchased materials necessary to continue its distribution business." *Burdett Oxygen Co.*, 249 A.2d at 301. It then rejected a distinction between "directly essential" transactions and "indirectly essential" transactions, finding the distinction "not in keeping with the rationale of Rule 2179, which is 'to permit a plaintiff to institute suit against the defendant in the county most convenient for him and his witnesses and to assure that the county selected had a **substantial relationship to the controversy** between the parties and was thereby a proper forum to adjudicate the dispute.'" *Id.* at 302 (emphasis added). In *Purcell*, Bryn Mawr Hospital argued *Burdett* created a venue test requiring a nexus between the corporation's acts in the county and the underlying cause of action. *See* 579 A.2d at 1286. We rejected that argument, and instead adopted the Superior Court's reasoning (continued…)

that "each case rests on its own facts." *Id.* at 1286. Under these facts, we found the hospital's activity in Philadelphia did not meet the quality prong. We explained rotation and use of medical personnel from the Philadelphia teaching hospitals was "essentially an educational process" — the relationship between the hospitals was "predicated upon educational exchanges," and did not constitute business contacts for purposes of Rule 2179(a)(2). *Id.* at 1287. We further reasoned the arrangements with the medical schools were "mere incidental contacts" and were not essential to the hospital, which had its own permanent staff that was capable of treating patients alone. *Id.* Further, the mere purchase of supplies from Philadelphia merchants and advertisements in Philadelphia phone books and newspapers did not satisfy the quality prong. *See id.* ("Mere solicitation of business in a particular county does not amount to conducting business.").

### III. Parties' Arguments

Appellants argue the Superior Court misapplied the quality-quantity test and ask us to reverse its holding venue was proper in Philadelphia County. They stress quality and quantity are two independent prongs and that under *Monaco*, the quantity prong requires the acts be "so continuous **and** sufficient to be termed general or habitual." Appellants' Brief at 24, *quoting Monaco*, 208 A.2d at 256 (emphasis in original). According to appellants, this formulation prescribes a two-part inquiry, as "[a]cts that are adequately 'continuous' are not necessarily 'sufficient,' and *vice versa*." *Id.* at 25.

Relying on *Monaco*, *Canter*, and *Purcell*, appellants distill our precedent as providing four foundational principles that underlie the quality-quantity test: (1) "[q]uality

---

that *Burdett*'s language "relates to subdivision (a)(2) of Rule 2179 by requiring that the corporation which has been sued have sufficient connection to the county, rather than that the particular corporate acts which directly relate to the underlying cause of action have a sufficient nexus to the county." *Id.* (citation omitted). We elaborated "'[s]ubstantial relationship' is nothing more than synonymous language for minimum contacts which, in turn, bears directly on the meaning of 'regularly doing business.' It furnishes a complimentary interpretation of the quality-quantity test and nothing more." *Id.*

of acts means those acts directly furthering or essential to the corporation's existence; it does not include incidental acts which merely aid in the corporation's main purpose, *e.g.*, advertising or purchasing supplies"; (2) "[q]uantity means those acts which, collectively, are so continuous **and** sufficient to be general or habitual"; (3) "[c]ontinuity is established if the defendant's presence or operations in the county are habitual in the context of the particular business, or so prevalent as to be the equivalent of, *e.g.*, exercising franchises there or having its property there more or less without interruption"; and (4) "[s]ufficiency is established if the business activities in the forum county represent an adequate proportion of the defendants' overall business activities." *Id.* at 29. According to appellants, Pennsylvania courts have consistently used the percentage of a company's total business occurring in the venue as a reference point for sufficiency of the contacts independent from continuousness. *See id.*, *citing, inter alia*, *Singley*, 851 A.2d at 203; *PECO Energy Co.*, 802 A.2d at 669-70; *Battuello*, 598 A.2d at 1030.

Appellants argue the Superior Court departed from this well-established precedent when it stated the "percentage of a company's overall business that it conducts in a given county, standing alone, is not meaningful[.]" *Id.* at 31, *quoting Hangey*, 247 A.3d at 1142. They posit business activity can be quantified in one of two ways: either (1) proportionally in relation to the company's other business outside the county (*i.e.*, the percentage of the company's total business); or (2) in a vacuum, without regard to business outside the county. According to appellants, cases like *Monaco* and *Canter* establish the former method, proportionality, is the proper way to measure business activity for purposes of the quantity prong. *See id.* at 32-33. Relatedly, appellants argue, the Superior Court erred when it conflated the continuous and sufficient elements of the quantity prong by holding HPP's acts in Philadelphia County need only be "sufficiently continuous." *Id.* at 33, *citing Hangey*, 247 A.3d at 1141. They argue the distinction is material, because

under the formulation requiring both continuity and sufficiency, the percentage of business occurring in the venue can be highly relevant to sufficiency but not very relevant to continuity. They also contest the Superior Court's view that a too-small percentage of total business means the quantity prong is not met, only where the quality prong is also unsatisfied. They note *Monaco* and *Canter* analyzed the quantity prong using the percentages of total business where the quality prong was satisfied; and as the dissent below explained, quality and quantity are distinct, but the majority's reasoning would render the quantity prong irrelevant as quantity would always follow quality.

Appellants next claim the Superior Court improperly distinguished past cases where it found a small percentage of business did not satisfy the quantity prong based on the fact those cases involved small or local businesses, while HPP is a multi-billion-dollar company that conducts business throughout the United States. They argue the size of the company is irrelevant to which standard should be used in analyzing the quantity prong. Appellants maintain the application of different tests based on the size of the corporate defendant has no basis in precedent and would violate equal protection principles under both the United States and Pennsylvania Constitutions. *See id.* at 38-41, *citing*, *inter alia*, *Louis K. Liggett Co. v. Lee*, 288 U.S. 517, 536 (1933) ("Unequal treatment and arbitrary discrimination . . . between different corporations, inconsistent with the declared object of the legislation, cannot be justified by the assumption[ ] that a different classification for a wholly different purpose might be valid.").

Appellants further argue the Superior Court's decision has proven unworkable. They warn affirming the opinion would increase congestion and consumption of judicial resources in Pennsylvania's large urban centers. Appellants claim the courts of common pleas have been reluctant to sustain valid preliminary objections for improper venue in an attempt to follow the Superior Court's opinion in this case. They further believe the

Superior Court itself has struggled to faithfully apply its own rule. *See id.* at 47-53, *citing Hausmann v. Bernd*, 271 A.3d 486 (Pa. Super. 2022) (affirming trial court's finding of improper venue where company's percent of total business in Philadelphia County was .27%, which is 54 times greater than the percent the *en banc* panel found satisfied the quantity prong in this case).

Moving on to their second issue, appellants argue the Superior Court failed to apply the proper abuse of discretion standard of review. They recite:

> An abuse of discretion exists when the trial court [1] has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, [2] has failed to apply the law, or [3] was motivated by partiality, prejudice, bias, or ill will. A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion.

*Id.* at 53, *quoting Harman*, 756 A.2d at 1123 (citations omitted). Appellants elaborate, when "reviewing the trial court's exercise of discretion, it is improper for an appellate court to 'step[ ] into the shoes' of the trial judge and review the evidence *de novo*." *Id.* at 53-54, *quoting Polett v. Pub. Commc'ns, Inc.*, 126 A.3d 895, 924 (Pa. 2015). Specific to appeals from venue transfers, appellants note this Court has stated if "there exists any proper basis for the trial court's decision to transfer venue, the decision must stand." *Id.* at 54, *quoting Bratic v. Rubendall*, 99 A.3d 1, 7 (Pa. 2014). They caution that failing to follow these dictates will chill and deter trial courts from exercising their discretion.

Appellants argue the Superior Court misapplied the abuse of discretion standard because it simply substituted its own judgment for that of the trial court. The Superior Court did not specify which of the three *Harman* criteria it used to find an abuse of discretion, and according to appellant, none applies here. They argue the trial court did not "fail to apply the law," since the trial court applied the required quality-quantity test. *Id.* at 57. Appellants contend the Superior Court simply disagreed with how the trial court weighed the evidence. They also note the Superior Court made no finding the trial court's

decision was "manifestly unreasonable, arbitrary, or capricious" or that the court "was motivated by partiality, prejudice, bias, or ill will." *Id.* at 59, *quoting Harman*, 756 A.2d at 1123.

Finally, appellants fault the Hangeys for failing to present their own evidence to quantify HPP's transactions. They further claim the trial court did not solely rely on the *de minimis* percentage of HPP's sales occurring in Philadelphia County and that the Superior Court did not identify any evidence the trial court ignored. Instead, they argue, "[t]he trial court received and carefully considered the totality of relevant evidence as to HPP's business contacts with Philadelphia County, including but not limited to the lack of daily operations in the county, the lack of a physical presence there, the lack of employees there, and only a smattering of sales there." *Id.* at 60.

The Hangeys respond that the Superior Court correctly held the percentage of a corporate defendant's sales in the forum county is relevant to, but not dispositive of, the quantity prong. They believe the trial court incorrectly held venue was improper because HPP's sales in the county were too small compared to its total sales throughout the United States. The Hangeys explain that even though the trial court acknowledged other evidence (that HPP's sales of its consumer outdoor products in Philadelphia County totaled over $81,000 in 2014, over $69,000 in 2015, and over $75,000 in 2016), it focused exclusively on the proportion of those sales compared to HPP's $1.393 billion of total sales in the United States in 2016 — a mere 0.005%.

The Hangeys further argue the trial court erred and abused its discretion for several reasons. Primarily, neither this Court nor the Superior Court has ever held the quantity analysis may be based solely on the percentage of a company's nationwide revenue earned in the forum county. Instead, that percentage is but one of many factors. The Hangeys initially focus on *Monaco*, where the Court first applied *Shambe*'s quality-

quantity test to the "regularly conducts business" text in Rule 2179(a)(2) and adopted *Shambe*'s language that "[b]y 'quantity of acts' is meant those which are so continuous and sufficient to be termed general or habitual. A single act is not enough." Hangeys' Brief at 24, *quoting Monaco*, 208 A.2d at 256; *Shambe*, 135 A. at 757.[13] The Hangeys further emphasize that in finding the taxicab company's acts in Philadelphia County "were performed habitually and, therefore, were of sufficient quantity[,]" the *Monaco* Court instructed:

> It must be remembered that it is the word 'regularly' which we are construing and not 'principally.' A corporation may perform acts 'regularly' even through these acts make up a small part of its total activities. . . . The question is whether the acts are being 'regularly' performed within the context of the particular business.

*Id.* at 25-26, *quoting Monaco*, 208 A.2d at 256 (emphasis omitted).

The Hangeys acknowledge that in *Monaco*, the fact five to ten percent of the company's taxi rides were completed in Philadelphia County did not establish the distance the taxis traveled in the county compared to distance traveled elsewhere, or even the percentage of overall revenue the company earned for driving customers within the county. Nevertheless, they argue, the Court held the company regularly conducted business in Philadelphia County based solely on where those rides ended. The Hangeys call attention to three Philadelphia Court of Common Pleas decisions the *Monaco* Court cited approvingly, all of which support their position. *See id.* at 27-29, *citing Iannetti v. Phila. Suburban Transp. Co.*, 61 Pa. D. &. C. 276, 278 (C.P. Phila. 1947) (venue over defendant bus company proper in Philadelphia County despite assertion "it does only an infinitesimal part of its business in Philadelphia"); *Lallone v. Phila. Transp. Co.*, 61 Pa. D.

---

[13] According to the Hangeys, in 1927 when *Shambe* was decided, the word "general" meant "not confined by specialization or careful limitation[,]" and the word "habitual" meant "occurring on a regular basis." Hangeys' Brief at 24-25 n.1, *citing* Merriam-Webster Online Dictionary; Lexico's Online Oxford English Dictionary.

& C. 248, 250 (C.P. Phila. 1948) ("The jurisdictional amenability of a corporation in these circumstances is not to be determined by the proportion of its business that it does in the county because the law has provided no basis of determining it, but rather on a determination of whether or not it regularly conducts business in the county[.]"); *Smerk v. Phila. Suburban Transp. Co.*, 13 Pa. D. & C.2d 454, 456 (C.P. Phila. 1958) (rejecting venue challenge premised on fact the company did not conduct a "substantial" portion of its business in the county, stating "[i]f the rule required that a corporation regularly conduct substantial business in the county, the rule would so state").

The Hangeys next argue *Canter* supports their position, and claim it is especially significant because it is our only other case evaluating Rule 2179(a)(2) in a product liability action. They note the *Canter* Court found venue proper where the defendant automobile seller consummated only 1 or 2% of its business in Philadelphia, and its gross sales and service business was $4.1 million in 1965. The Hangeys calculate it was possible fewer than sixteen of the company's automobile sales occurred in Philadelphia County in 1965, explaining the average cost of a new car that year was $2,650, and 1% of its gross sales of $4.1 million would have equaled $41,000. The Hangeys emphasize that in finding the quantity prong satisfied, the *Canter* Court reiterated that "[a] corporation may perform acts 'regularly' even though these acts make up a small part of its total activities." *Id.* at 30, *quoting Canter*, 231 A.2d at 143. They contend *Canter*, the only other product liability case addressing venue under Rule 2179(a)(2), **required** the conclusion HPP regularly conducts business in Philadelphia County.

Turning to *Purcell*, the Hangeys recognize the Court found it irrelevant that Bryn Mawr Hospital advertised for patients in Philadelphia, treated patients who resided in Philadelphia but traveled to the hospital in Montgomery County for treatment, had affiliations with residency programs of teaching hospitals based in Philadelphia, and

purchased goods and services from Philadelphia businesses. They stress *Purcell*'s holding the hospital's contacts with Philadelphia failed to satisfy the quality and quantity prongs was based on the foregoing facts and did not involve "any discussion of sales percentages whatsoever[.]" *Id.* at 33.[14]

The Hangeys argue appellants' approach would substitute the trial judge's discretion with a simple math calculation. They characterize appellants' argument pertaining to *Canter* as imposing a one percent cutoff, which they contend is arbitrary and not grounded in the case law. To meet that standard, the Hangeys observe HPP, whose annual sales in the United States exceed $1.3 billion dollars, would need to make more than $13 million in a county to qualify as regularly conducting business there. Further, they argue, relying solely on such a percentage "can be misleading and useless." *Id.* at 43. According to the Hangeys, a percentage could represent a small number of isolated sales of very expensive goods, or the same percentage could represent many regular sales of cheaper goods; but in this case, the facts established HPP's products are continuously offered for sale at two authorized dealers and at big box stores in Philadelphia County. Thus, the Hangeys claim the sales of HPP products in Philadelphia are frequent and regularly recurring rather than isolated and limited. They argue that although the percentage of total sales may be relevant in some cases, it has never been deemed legally determinative. They therefore argue the trial court abused its discretion

---

[14] The Hangeys also review the facts and reasoning from *Burdett* along with a slew of Superior Court decisions, arguing none of them precluded the lower courts from finding HPP regularly conducts business in Philadelphia County. *See* Hangeys' Brief at 31-32, 33-42, *citing*, *inter alia*, *Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 971 (Pa. Super. 2009) (quantity prong satisfied where defendant, who operated a plant that rendered chickens and produced meat products, sold products to brokers in Philadelphia County constituting less than 0.5% of its total premium chicken sales and about 1.9% of its total B grade product sales); *Mathues v. Tim-Bar Corp.*, 652 A.2d 349, 351 (Pa. Super. 1994) (quantity prong unsatisfied where defendant's acts in venue were "isolated and limited" and consisted of only "two or three sales").

because it was legal error to rely almost exclusively on and assign dispositive weight to that percentage.

The Hangeys dispute appellants' criticism of the Superior Court for using the phrase "sufficiently continuous" instead of "continuous and sufficient" when describing the requirements of the quantity prong. They raise doubts that there is any meaningful difference between the two phrases and admonish that "the language of an opinion is not always to be parsed as though we are dealing with the language of a statute." *Id.* at 49, *quoting Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). But, they note, the current edition of *Black's Law Dictionary* defines "sufficient" as "[a]dequate; of such quality, number, force, or value as is necessary for a given purpose." *Id.*, *quoting Sufficient,* BLACK'S LAW DICTIONARY (11th ed. 2019). They argue the *Shambe* and *Monaco* Courts' use of the phrase "continuous and sufficient" can be understood as asking whether the business the defendant company conducts in a given county is both continuous and of the **quality** necessary to satisfy the regularly conducts business test. Alternatively, they argue, even if those Courts intended for "sufficient" to mean "adequate" or "enough," that meaning still would not call for a comparison of sales within the forum county to nationwide sales.

The Hangeys also refute appellants' contention that considering the size of the company when analyzing the quantity prong violates equal protection principles. They argue a company with regular and recurring sales in a forum county should qualify as regularly doing business within that county, regardless of the company's size or its sales in other places. They therefore claim appellants' equal protection argument fails because large and small companies are treated identically. Moreover, they assert the appellants waived this argument by failing to raise it below or in their petition for allowance of appeal.

Regarding appellants' argument the Superior Court's opinion opens the floodgates of litigation in Pennsylvania's large urban counties, the Hangeys maintain the ruling applies equally to all counties. They insist there is nothing untoward about plaintiffs suing in the venues they believe will be most advantageous to their cases, so long as the venue is proper under the rules. And, the Hangeys emphasize, Rule 2179(a)(2) provides for venue in any county where a company regularly conducts business, regardless of whether the cause of action has a connection with the county. They argue every company has control over where it regularly conducts business, so if a company does not want to be subject to suit in a particular county, it can refrain from regularly conducting business there. Plus, they explain, even when venue is established, principles of *forum non conveniens* still allow a defendant to seek transfer to another county. But according to the Hangeys, HPP exposed itself to suit in Philadelphia County when it purposely allowed sales of HPP products within the county through its authorized dealers.

The Hangeys assert the Superior Court's opinion is not unworkable. They note that in five of the six cases where the Superior Court has applied its opinion in this case, the Superior Court has affirmed the trial courts' venue rulings,[15] and appellants' argument the Superior Court's opinion is unworkable is premised solely on their false assumption the percentage of total sales is dispositive. The Hangeys reiterate this Court's instruction in *Purcell* that "each case must depend on its own facts." *Id.* at 60, *quoting Purcell,* 579 A.2d at 1285.

---

[15] *See* Hangeys' Brief at 60-61, *citing Hausmann v. Bernd*, 271 A.3d 486 (Pa. Super. 2022) (affirming transfer of venue); *J.P. ex rel. Pinkston v. Sherman St. Soccer, LLC*, 2022 WL 419470 (Pa. Super. Feb. 11, 2022) (same); *Dibble v. Page Transp., Inc.*, 2021 WL 5408725 (Pa. Super. Nov. 19, 2021) (same); *Abdelaziz v. B. Braun Med. Inc.*, 2021 WL 3358760 (Pa. Super. Aug. 3, 2021) (same); *Hall v. HPP*, 2022 WL 2287020 (Pa. Super. June 24, 2022) (affirming denial of challenge to venue); *Almonte v. ECN Staffing, Inc.*, 2021 WL 1502887 (Pa. Super. Apr. 16, 2021) (reversing venue transfer finding defendant regularly conducted business in forum county).

Turning to the second issue, the Hangeys argue the Superior Court properly found the trial court abused its discretion because its order transferring venue was predicated on a legally erroneous holding — that a corporation does not regularly conduct business in a particular county unless at least one percent of its nationwide sales is derived from that county. *See id.* at 63-64. They further argue the Superior Court correctly concluded HPP regularly conducts business in Philadelphia County because the record shows numerous, continuous, and systematic sales of HPP products occurred within the county, notwithstanding the percentage of total sales.[16]

In their reply brief, appellants insist the Superior Court erred in finding an abuse of discretion. Emphasizing the latitude of discretion afforded to trial courts in this context, appellants cite our decision in *Bratic v. Rubendall* for the assertion that "[i]f there exists any proper basis for the trial court's decision to transfer venue, the decision must stand." Appellants' Reply Brief at 1, *quoting Bratic*, 99 A.3d at 8 (Pa. 2014). They further argue that when a trial court applies the prescribed test, mere disagreement with its outcome cannot establish an error of law; otherwise, abuse of discretion review would be indistinguishable from *de novo* review. Here, they assert, the trial court applied the well-established quality-quantity test and reached a reasonable conclusion based on the totality of the evidence.

Appellants believe it was the Superior Court that committed legal error. They argue controlling law permitted the trial court to consider the *de minimis* proportion of HPP's total business done in Philadelphia County, but there was no singular basis for the court's decision. They claim the record included ample evidence of HPP's lack of

---

[16] The Pennsylvania Association for Justice wrote an *amicus curiae* brief supporting affirmance, which aligns with the Hangeys' arguments. Specifically, it notes "there is nothing talismanic about the percentage of revenue generated in the forum county. What matters is the totality of the evidence." Pa. Ass'n for Justice *Amicus* Brief at 5.

business activities in the county, and the Hangeys only point to HPP's $75,310 of local sales in 2016 as establishing regularity. Appellants contend the Hangeys fail to point to specific record evidence that the trial court ignored and thus waived the argument. But even if not waived, appellants stress the record shows HPP's Philadelphia County revenue was derived primarily from sales to just one independent retailer, and it contains no evidence of sales volume. They assert it was the Hangeys' burden to produce such evidence. *See id.* at 13, *citing Hausmann*, 271 A.3d at 493 ("once [the movants] properly raise the issue of venue and provide some evidence . . . to dispel or rebut the plaintiff's choice, the burden shifts back to the party asserting proper venue") (internal quotation and citation omitted).

Appellants also challenge the Hangeys' characterization of the trial court applying a bright-line floor of one percent. They claim nothing in the trial court's opinion suggests it would have reached the same conclusion if HPP's Philadelphia County sales fell just below one percent or that it would have disregarded evidence of other relevant business activities. They argue that just because the trial court compared the 0.005% here to the 1-2% found satisfactory in *Canter* does not mean the court applied a 1% cutoff. Instead, appellants argue, the trial court deemed HPP's Philadelphia County sales of insufficient quantity because they represented a truly *de minimis* amount of HPP's sales. Appellants further argue the Hangeys ignore the Superior Court's departure from established law when it held the percentage alone could not be dispositive. They claim the Superior Court's reasoning "all but precludes trial courts from assessing defendants' local business activities in the context of their overall business[,]" even though *Monaco* and its progeny endorse that method of quantifying a business. *Id.* at 18.

Appellants add that the Hangeys' interpretation of "regularly conducts business" conflicts with the jurisdictional nature of venue. *See id.* at 23, *citing*, *inter alia*, *Purcell*,

579 A.2d at 1284 (Rule 2179(a)(2) "provides a theory of transient jurisdiction by counties in which the corporation is present by virtue of its business activities or contacts"). They note that in *Shambe*, which concerned personal jurisdiction, the Court held the essential elements which constitute "doing business," as required by our laws, are "the same as those . . . necessary under the due[-]process clause of the federal Constitution." *Id.* at 24, *quoting Shambe*, 135 A. at 757, *and citing Law*, 79 A.2d at 253-55 ("doing business" for venue purposes implicates the same inquiry as for personal jurisdiction). Appellants consider federal personal jurisdiction cases to be relevant support for their contention a defendant company's business must be considered in the context of its overall business, not just its local activity. *See id.* at 26-27, *citing Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945); *and Daimler AG v. Bauman*, 571 U.S. 117, 139 n.20 (2014) ("[T]he general jurisdiction inquiry does not focus solely on the magnitude of the defendant's in-state contacts. . . . General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide.") (internal citation, quotation, and alteration omitted).

Finally, appellants urge the Court to reject the Hangeys' request for a "drastic" change in the law. *Id.* at 32. They conclude the Superior Court misapplied the abuse of discretion standard of review because, "[w]here the record showed no relevant and evidentially supported business activities in Philadelphia County apart from HPP's $75,310 in annual sales to a few commercial customers, constituting 0.005% of HPP's total sales, 'there was clearly a proper evidentiary basis' for the trial court's conclusion, and it thus 'did not abuse its discretion in granting the motion transferring the case.'" *Id.* at 35, *quoting Bratic*, 99 A.3d at 10.[17]

---

[17] *Amici Curiae* the Chamber of Commerce of the United States of America, the Pennsylvania Coalition for Civil Justice Reform, the Pennsylvania Chamber of Business and Industry, the National Federation of Independent Business, the Pennsylvania (continued…)

## IV. Analysis

The rules governing venue are prescribed in the Pennsylvania Rules of Civil Procedure. Pennsylvania Rule of Civil Procedure 1006(d)(1) gives trial courts considerable discretion to determine whether to grant a change of venue, and such a determination will not be disturbed on appeal absent an abuse of discretion. *See Purcell*, 579 A.2d at 1284. "An abuse of discretion is not merely an error of judgment, but occurs only where the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record." *Zappala v. Brandolini Prop. Mgmt., Inc.*, 909 A.2d 1272, 1284 (Pa. 2006). An appellate court cannot find an abuse of discretion simply because it might have reached a different conclusion; "[i]f there exists any proper basis for the trial court's decision to transfer venue, the decision must stand." *Id.* When resolving questions of law, however, our standard of review is *de novo* and our scope is plenary. *See id.* at 1280.

---

Manufacturers Association, the Pennsylvania Medical Society, and Leadingage PA have jointly filed a brief in support of reversal. Their brief largely echoes appellants' positions, adding that the Superior Court's opinion "undermines the purpose of [Rule 2179] 'to assure that the county selected ha[s] a substantial relationship to the controversy between the parties and was thereby a proper forum to adjudicate the dispute.'" U.S. Chamber of Commerce *et al. Amici* Brief at 14, *quoting Cty. Constr. Co. v. Livengood Constr. Corp.*, 142 A.2d 9, 13 (Pa. 1958). *Amicus Curiae* Philadelphia Association of Defense Counsel also wrote in support of appellants, contributing an argument that the 1944 addition of the word "regularly" to Rule 2179(a)(2) was meant to curtail venue where a defendant conducted only a *de minimis* amount of its business. *See* Phila. Ass'n of Defense Counsel *Amicus* Brief at 6-7. And like appellants, it urges us to apply modern concepts of personal jurisdiction to the venue context. *See id.* at 9-11, *citing, inter alia, Mallory v. Norfolk S. Ry. Co.*, 266 A.3d 542, 550 (Pa. 2021) (finding under federal general personal jurisdiction cases like *Daimler*, a defendant's contacts must be "so continuous and systematic as to render [it] essentially at home in the forum State") (alterations, quotations, and citations omitted), *rev'd*, 600 U.S. 122 (2023) (reversing our decision in *Mallory* after the parties and *amici* submitted their briefs in this case).

Rule 1006(b) specifies actions against corporations and similar entities "may be brought in and only in the counties designated by" Rule 2179. Pa.R.Civ.P. 1006(b). Rule 2179, in turn, as noted above, provides:

> **(a) General Rule.** Except as otherwise provided by an Act of Assembly or by subdivision (b) of this rule, a personal action against a corporation or similar entity may be brought in and only in a county where
> (1) the registered office or principal place of business of the corporation or similar entity is located;
> **(2) the corporation or similar entity regularly conducts business**;
> (3) the cause of action arose;
> (4) a transaction or occurrence took place out of which the cause of action arose; or
> (5) the property or a part of the property, which is the subject matter of the action, is located provided that equitable relief is sought with respect to the property.

Pa.R.Civ.P. 2179(a) (emphasis added). Additionally, in an action to enforce joint and several liability against two or more defendants, venue may lie "against all defendants in any county in which the venue may be laid against any one of the defendants[.]" Pa.R.Civ.P. 1006(c). The plaintiff generally gets to choose the forum "so long as the requirements of personal and subject matter jurisdiction are satisfied." *Purcell*, 579 A.2d at 1284. A party seeking a venue transfer therefore "bears the burden of proving that a change of venue is necessary[.]" *Id.*

As stated above, in evaluating whether a company "regularly conducts business" in the forum county under Rule 2179(a)(2), courts are to perform the quality-quantity analysis first articulated in *Shambe*:

> [T]he business engaged in must be sufficient in quantity and quality . . . . The term 'quality of acts' means those directly furthering, or essential to, corporate objects; they do not include incidental acts. . . . By 'quantity of acts' is meant those which are so continuous and sufficient to be termed general or habitual. A single act is not enough. . . . Each case must depend on its own facts[.]

*Shambe*, 135 A. at 757-58; *see also Monaco*, 208 A.2d at 256. For the reasons below, we hold the trial court erred when applying the quantity prong, and therefore abused its discretion when it sustained appellants' preliminary objections to venue and transferred the case to Bucks County.

Preliminarily, we agree with the Superior Court that the trial court in fact gave dispositive weight to the percentage of HPP's national revenue attributable to direct sales in Philadelphia County. The relevant portion of the trial court's opinion stated:

> With respect to the "quantity" prong, the Supreme Court instructed, "[a] single act is not enough, while each case must depend on its own facts." *Purcell*, 579 A.2d at 1285. In the case of *Canter*[,] . . . the Supreme Court held the trial court did not abuse its discretion in holding that doing 1% to 2% of the total business in a given forum satisfies the quantity prong. Here, the evidence of record shows that in 2016, only $75,310.00 out of [HPP's] $1.393 billion national revenue came from direct sales in Philadelphia County; this amounts to 0.005% of [HPP's] annual revenue that is attributable to direct sales in Philadelphia County. The figures from 2014 and 2015 are similar. This *de minimis* amount of business, 1/100th of the amount found sufficient in *Canter*, is not general and habitual. Comparatively, [HPP's] direct sales within Bucks County, where Plaintiffs purchased the subject lawnmower from [Trumbauer's], accounted for approximately 0.2% of [HPP's] 2016 revenue.[ ] Affidavit of John Stanfield at ¶ 22. **For these reasons,** this Court finds [HPP's] activities fail to satisfy the "quantity" prong of the *Purcell* analysis.

Trial Court Op. at 5-6 (emphasis added). The trial court further explained if HPP's business were distributed evenly among the 3,141 counties in the United States, HPP could expect to do 0.031% of its business in each county. *See id.* at 6 n.2. It determined HPP's actual business in Philadelphia County represented one-sixth of that amount, *i.e.*, 0.005%. *See id.*

It is clear from this excerpt the trial court made its decision based only on the percentage of HPP business conducted in Philadelphia County. Although the court acknowledged the raw $75,310 revenue figure from 2016, it did so only to calculate the percentage out of HPP's $1.393 billion in national revenue. It used the 0.005% figure

alone to reach the conclusion HPP conducted only a "*de minimis* amount of business" in Philadelphia County. *Id.* at 6. Its reasoning consisted solely of a comparison of that percentage to the percentages in *Canter*, HPP's sales in Bucks County, and the hypothetical mean percentage it calculated for all counties in the United States. And the trial court was explicit: it was "[f]or these reasons" HPP's "activities fail to satisfy the 'quantity' prong[.]" *Id.* Thus, even presuming the trial court considered all evidence of record in making its determination, there is no ambiguity as to **why** the trial court found the quantity prong unsatisfied: it considered 0.005% too low.

The trial court's reasoning conflicts with our precedent for a couple of reasons. Primarily, the percentage of a defendant corporation's national revenue derived in the forum county is not alone sufficient to determine the corporation did not "regularly conduct business" there for purposes of Rule 2179(a)(2). We have explicitly held, and we reaffirm here, that "it is the word 'regularly' which we are construing and not 'principally.' A corporation may perform acts 'regularly' **even though these acts make up a small part of its total activities**." *Canter*, 231 A.2d at 142, *quoting Monaco*, 208 A.2d at 256 (emphasis added). Finding HPP's business in Philadelphia County accounted for only 0.005% of its business nationally, the trial court determined HPP's business in Philadelphia County "ma[d]e up a small part of its total activities." *Id.* But, the court's use of that determination — without more — to conclude the quantity prong was unsatisfied directly contravenes our holdings in *Monaco* and *Canter* and was therefore legal error.

We likewise reject appellants' argument the word "sufficient" as used in *Shambe*'s articulation of the quantity prong — acts "which are so continuous and sufficient to be termed general or habitual[,]" 135 A. at 757 — necessarily **requires** the trial court to quantify a company's business in comparison to its total national business. Essentially, appellants isolate the phrase "continuous and sufficient" from the rest of the quotation in

an attempt to impute a proportionality threshold to the word "sufficient," as distinct from the word "continuous." *See* Appellants' Brief at 29 (claiming "[c]ontinuity is established if the defendant's presence or operations in the county are habitual in the context of the particular business, or so prevalent as to be the equivalent of, *e.g.*, exercising franchises there or having its property there more or less without interruption"; while "[s]ufficiency is established if the business activities in the forum county represent an adequate proportion of the defendants' overall business activities").

We have never held the word "sufficient" in the quantity prong requires a comparison to the company's overall national business. Appellants' argument the word "continuous" encompasses the notion the acts could be deemed "habitual," while the word "sufficient" means something completely distinct from "continuous" (and therefore detached from "habitual") presents a strained, unnatural reading of *Shambe*. Instead, we look at the quantity prong as a whole; we consider whether the acts are "continuous and sufficient" to the extent they could be called "general or habitual." *Shambe*, 135 A. at 757. Like the continuity requirement, the sufficiency requirement is also related to the "general or habitual" nature of the acts.

To clarify, the word "sufficient" in the quantity prong refers to the acts deemed sufficient under the quality prong. It is those sufficient, quality acts that must be performed regularly to satisfy the venue inquiry. As the *Monaco* Court explained, "[c]learly, the acts of driving into Philadelphia County at the request of customers and collecting fares there were acts directly essential to and in furtherance of corporate objects and, therefore, were of sufficient **quality**. Just as clearly, **the acts** were performed habitually and, therefore, were of sufficient **quantity**." 208 A.2d at 256 (emphasis added). Thus, because the taxicab company's **acts** were of sufficient quality, and were performed on a regular basis, the quantity prong was satisfied. The quantity prong's requirements go to recurrence and

frequency of qualifying acts occurring within the county, but the question of whether acts in a particular county are "general or habitual" does not directly implicate comparisons to revenue generated elsewhere in the United States. Again, we emphasize the crux of the court's inquiry is regularity. *See id.*[18]

---

[18] Appellants contend that disallowing sole reliance on the percentage of national sales would be a departure from our venue case law in this context, which is historically related to general personal jurisdiction principles. *See* Appellants' Reply Brief at 23-27, *citing*, *inter alia*, *Daimler*, 571 U.S. at 139 n.20 ("General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide.") (internal citation, quotation, and alteration omitted). We decline to import wholesale the evolving federal general personal jurisdiction principles to our venue caselaw under Rule 2179(a)(2). While there may be some opportunities to borrow rationale in appropriate cases, *see, e.g.*, *Law*, 79 A.2d at 253 (citing *International Shoe* for the proposition mere solicitation does not establish 'doing business'), we must remember *Shambe* was decided before the High Court's seminal opinion in *International Shoe*. Notably, our quality-quantity test for venue under Rule 2179(a)(2) has not changed since the *Monaco* Court adopted *Shambe*'s reasoning; we have never applied the modern general personal jurisdiction test from *Daimler* — that contacts be "so 'continuous and systematic' as to render them essentially at home in the forum State," *Daimler*, 571 U.S. at 127 (citation omitted) — to the venue requirements in Rule 2179(a)(2). In fact, the footnote from *Daimler* that appellants cite undercuts their argument, reasoning: "[a] corporation that operates in many places can scarcely be deemed at home in all of them. Otherwise, 'at home' would be synonymous with 'doing business' tests framed before specific jurisdiction evolved in the United States." *Daimler*, 571 U.S. at 139 n.20. In other words, the evolution of specific personal jurisdiction in cases like *International Shoe* and its progeny has narrowed the previous conceptions of general personal jurisdiction under the old "doing business" tests in effect when *Shambe* was decided. What's more, the high court's recent holding in *Mallory* eliminates the notion the due process clause allows for general personal jurisdiction over a corporation only where it could be considered "at home." *See Mallory*, 600 U.S. at 134-36 (finding Pennsylvania had general personal jurisdiction over Norfolk Southern because it consented to suit in the Commonwealth by complying with our foreign corporation registration laws).

Moreover, while not ruling them out as always obsolete, we question the degree of relevance of the percentage of **national** revenue when determining questions of venue, which are distinct from questions of personal jurisdiction. Unlike personal jurisdiction (which implicates questions of whether a court in a particular state may exercise its jurisdiction over the litigants and bind the parties to its decision consistent with the due process guarantees in the Fourteenth Amendment), venue analyses require our courts to determine which **Pennsylvania** county or counties would serve as an appropriate forum. *See Purcell*, 579 A.2d at 1283 n.1. And while cases like *Monaco* and *Canter* used (continued…)

Indeed, viewed in isolation, the percentage of a company's total revenue derived from the forum county cannot establish that the company does not regularly conduct business within that county. First, as the Superior Court explained, "[a] small or local business may do all of its work in just a few counties or even a single one, while a large business may span the entire nation. Indeed, the percentage of sales a multi-billion-dollar company makes in a particular county will almost always be a tiny percentage of its total sales." *Hangey*, 247 A.3d at 1142. If courts were to look at the percentage of sales only, a small business and a large business could theoretically conduct the exact same amount of business in the same county, and the small business could be subject to venue in the county while the large business is not.[19] It would be absurd for the courts to find one company is regularly conducting business while another company is not regularly conducting business, even if the two companies were conducting the exact same amount of business.[20] To hold otherwise would also undermine the recognized purposes of Rule

percentages, it appears the corporations in those cases operated on a more local basis. *See Monaco*, 208 A.2d at 256 (involving a cab company operating out of Montgomery County and licensed by the Pennsylvania Public Utility Commission); *Canter*, 231 A.2d at 141 (involving a company that had its principal place of business and registered office in Delaware County, along with another location in Montgomery County). Those cases certainly did not establish a litmus test based on the percentage of **national** revenue.

[19] Or, as *amicus* the Pennsylvania Association for Justice illustrates in a hypothetical: a new small business based in Beaver County could generate $50,000 in its first year from daily sales in Allegheny County, which would account for a majority of its business that first year, such that it regularly conducted business in Allegheny County. But as time goes on, the company could see great success and expand to sell millions nationwide. If it still sold only $50,000 in Allegheny County, under the trial court's analysis, the same company conducting the same amount of business may no longer be regularly conducting business in Allegheny County, simply because its business grew elsewhere. *See* Pa. Ass'n for Justice *Amicus* Brief at 7-8.

[20] For this reason, we reject appellants' contention that disallowing trial courts from considering only a defendant company's percentage of national sales from the forum county somehow violates equal protection principles. *See* Appellants' Brief at 38-41. For companies of all sizes, courts must look to other evidence to determine the regularity of
(continued…)

2179(a), which was not only meant to promote convenience for the litigants, but was also meant to account for the relationship the forum's community holds with the lawsuit. *See Cty. Constr. Co.*, 142 A.2d at 13; *Purcell*, 579 A.2d at 1286. Viewed from the perspective of those in the forum county, two companies conducting the same amount of business can have the same impact on the community, regardless of whether one of the companies conducts substantially more business elsewhere.

Another variable that could impact a company's percentage of sales in a particular county is its rate of success in that county. For instance, a company could have a brick-and-mortar location in the forum county that, for whatever reason, does not do as well as the company's locations in other counties. Perhaps that location has a poor manager, or unmotivated employees, or is in an inaccessible part of town. Or maybe the company sells merchandise that is not a particular draw for the county's residents (*e.g.*, lawnmowers in an urban area with relatively few lawns). Yet day after day, the business opens its doors to prospective customers, offering its goods and services to those within the county. A company can "regularly conduct business," even if it is not making a lot of money from that business. And to be sure, there are ways to quantify the amount of business a company conducts without reference to revenue. *See Burdett*, 249 A.2d at 301 ("Conducting business involves more than selling[.]").[21] For instance, business can

the business acts. Any argument that companies of all sizes must be subject to the same percentage threshold to satisfy equal protection incorrectly presupposes the percentage of sales alone can be dispositive. For the reasons explained herein, it cannot.

[21] The *Purcell* Court may have walked back the breadth of the rationale in *Burdett* that "certainly it cannot be denied that appellant was doing business when it purchased materials necessary to continue its distribution business." 249 A.2d at 295; *see Purcell*, 579 A.2d at 1287 (holding "the mere purchase of hospital supplies from Philadelphia merchants cannot form a satisfactory rationale for conferring venue"). But despite its explicit discussion of *Burdett*, *Purcell* did not overrule that case or its concept that companies conduct business in ways other than just making sales. *See Purcell,* 579 A.2d at 1286-87.

be measured in days out of the year a business is open to the public, in units of product sold, or in hours billed by employees. So long as the business activities are not mere "incidental acts," their occurrences count toward the quantity prong even if they do not generate a lot of revenue. *Shambe*, 135 A. at 757; *Monaco*, 208 A.2d at 256.

Of course, this is not to say the trial courts are prohibited from considering the percentage of national revenue. But as explained, even if the court finds the percentage relevant in that particular case, it is simply a data point that must be considered in the context of the company as a whole to determine **regularity**. For instance, in *Monaco*, there is no question the Court considered that "five to ten percent of [the taxicab company's] fares are collected in Philadelphia County at the end of rides which involve driving a cab there." 208 A.2d at 256. But its analysis continued, explaining, "[a]nd, of course, the cab must be driven in Philadelphia County in order to return to Montgomery County, although it must be done without a passenger." *Id.* The Court's analysis didn't hinge on the fact that five to ten percent of the company's overall revenue was collected in Philadelphia County; it tied the amount of fares to the act of fare collection and, more importantly, to the core business act of driving within the county, both before and after fare collection. Critically, the analysis was based on the regularity with which the cab company performed those acts. This is made clear in *Monaco*'s ultimate statement of its holding:

> Clearly, the acts of driving into Philadelphia County at the request of customers and collecting fares there were acts directly essential to and in furtherance of corporate objects and, therefore, were of sufficient quality. Just as clearly, **the acts were performed habitually and, therefore, were of sufficient quantity**.

*Id.* (emphasis added), *citing Iannetti*, 61 Pa. D. & C. at 278 (rejecting defendant bus company's argument it conducted "only an infinitesimal part of its business" in Philadelphia County where it "not only collect[ed] fares but apparently furnishe[d] service

within the county directly to its patrons"); *and Lallone*, 61 Pa. D. & C. at 250 (same; "[t]he jurisdictional amenability of a corporation in these circumstances is not to be determined by the proportion of its business that it does in the county because the law has provided no basis of determining it, but rather on a determination of whether or not it regularly conducts business in the county").

Indeed, immediately after stating this holding, the *Monaco* Court made clear it was not concerned with the size of the percentage:

> It must be remembered that it is the word 'regularly' which we are construing and not 'principally.' A corporation may perform acts 'regularly' even through these acts make up a small part of its total activities. . . . Nor does 'regularly' necessarily mean, as defendant contends, that the acts must be performed on a fixed schedule or, when driving is involved, over a fixed route. The question is whether the acts are being 'regularly' performed within the context of the particular business.

*Id.*, *citing Smerk*, 13 Pa. D. & C.2d at 456 (rejecting argument defendant must conduct a "'substantial' portion" of its business in the forum county). Thus, although the Court considered that "[f]rom five to ten percent of [the taxicab company's] gross business" was derived from rides where fares were collected in Philadelphia County, its analysis was centered on the actual conduct that occurred in Philadelphia, not the magnitude of the revenue.

The same can be said of the *Canter* Court's use of a percentage. In *Canter*, the Court quoted the reasoning and holding in *Monaco* at length before determining Motor Sport's business activities satisfied the quality-quantity test. *See* 231 A.2d at 142. Though the Court considered that only one to two percent of Motor Sport's total business came from Philadelphia County, that reasoning must be read in context. First, in considering the quality prong, the Court did not consider only the revenue derived: "[t]he acts of driving into Philadelphia to demonstrate cars and to consummate sales were acts directly essential to and in furtherance of corporate objects." *Id.* at 143. Then, turning to

the quantity prong, the Court once again stressed it was concerned with the **regularity** of the business acts, not their proportion out of the total business: "we must consider the word 'regularly,' which we are construing. As we said in *Monaco*, and which we repeat here, '[a] corporation may perform acts 'regularly' even though these acts make up a small part of its total activities.'" *Id., quoting Monaco*, 208 A.2d at 256. Only then did the *Canter* Court conclude "1 to 2 percent of the total business was sufficient to satisfy the test set up in *Monaco* as to quantity." *Id.* In other words, **even though only one to two percent** of Motor Sport's gross sales came from Philadelphia County, the quantity prong was satisfied because the minuteness of the percentage did not matter. *See id.* at 142-43. All that mattered was the **regularity** with which Motor Sport was performing its business activity of coming into Philadelphia to demonstrate cars and make sales. *See id.* at 143.

What's more, the trial court's reasoning here was also legally erroneous to the extent it used the percentage in *Canter* as some sort of benchmark (even if it did not use it as a strict cut-off). *See* Trial Court Op. at 5-6 (reviewing the holding in *Canter*, evaluating the evidence here that 0.005% of HPP's annual revenue is attributable to direct sales in Philadelphia County, and concluding "[t]his *de minimis* amount of business, 1/100[th] of the amount found sufficient in *Canter*, is not general and habitual"). We have reaffirmed time and again that "each case must depend on its own facts." *Purcell*, 579 A.2d at 1285; *Canter*, 231 A.2d at 142; *Monaco*, 208 A.2d at 256; *Shambe*, 135 A. at 757-58. Just because one to two percent was sufficient in *Canter* does not mean that a lesser percentage is insufficient here.[22] "The question is whether the acts are being 'regularly'

_____

[22] In fact, such reasoning is a logical fallacy called denying the antecedent. *See, e.g.*, Kristen K. Robbins, *Paradigm Lost: Recapturing Classical Rhetoric to Validate Legal Reasoning*, 27 VT. L. REV. 483, 513-14 (2003) ("When a writer argues in the form of an 'if, then' clause, she is arguing that the truth of the antecedent (the 'if' clause) affirms the consequent (the 'then' clause). . . . Where the minor premise denies the existence of the antecedent, it is not valid to also deny the existence of the consequent.") (footnote omitted). "If x, then y" does not necessarily mean "if not x, then not y."

performed **within the context of the particular business**." *Monaco*, 208 A.2d at 256 (emphasis added). Needless to say, Motor Sport, a business operating out of Montgomery and Delaware Counties that sold and serviced new and used automobiles in the 1960s was an entirely different company than HPP, a multi-billion-dollar company that sells lawn equipment nationally more than fifty years after *Canter* was decided. While it is not clear that the trial court set a harsh one percent floor as the Hangeys argue, its summary comparison to the completely different business in *Canter* was just as arbitrary. Thus, the trial court also erred when it held HPP's business was not general and habitual by relying on a simple comparison to *Canter*.

For all the foregoing reasons, we affirm the Superior Court's holding that the trial court's reasoning was legally erroneous. We turn next to the Superior Court's determination that venue was proper because HPP regularly conducts business in Philadelphia County. The Superior Court concluded that "based on the totality of the evidence, HPP's contacts satisfied the quantity prong of the venue test." *Hangey*, 247 A.3d at 1142-43 (citing the facts that HPP had an authorized dealer in Philadelphia and sold $75,310 worth of products through that dealer in 2016). We agree.

First, when analyzing the quality prong, the trial court held "there is no question [HPP's] activities in Philadelphia satisfy the 'quality' prong . . . ." Trial Court Op. at 5. It elaborated that HPP "is in the business of distributing consumer outdoor products, such as lawnmowers, to retailers, who in turn sell the products to consumers." *Id.* The court then held HPP "furthers this business objective by distributing products to two Philadelphia retailers[.]" *Id.* No party has challenged these rulings on appeal. The record reflects those "two Philadelphia retailers" are authorized dealers, DL Electronics, Inc., and S&H Hardware and Supply Co., which have physical, "specific place[s] of business" in

Philadelphia County. Stanfield Suppl. Aff. at ¶¶20-21. Notably, HPP maintains separate contracts with its authorized dealers. *See* Stanfield Dep. at 108.

HPP has not produced any evidence that its business with its authorized dealers was not regular. Appellants do not contest that during the relevant time period, 2014 to 2016, HPP's sales to the authorized dealers remained consistent. *See* Appellants' Brief at 17 (explaining sales in Philadelphia County during those years averaged around $75,000 and over 81% of those sales were to authorized dealer DL Electronics, Inc.); *see also* Stanfield Dep. at 49 ("The figures are almost exactly the same for — or the percentages are almost exactly the same for '14 and '15" as they were for 2016). HPP admitted during venue discovery in 2017 that "since 2014 it has made sales to DL Electronics, Inc. and [S&H] Hardware and Supply Co." in response to an interrogatory asking it to "[i]dentify any and all business relationships with any Philadelphia County based company(ies) since the year 2000." HPP's Answers and Responses to Plaintiffs' Jurisdictional Interrogs. at 3 (specifying it interpreted the Hangeys' use of the term "business relationships" "to mean relationships with its authorized dealers located in Philadelphia County"). When asked if there had been "any interruption in the sale of [HPP] products being sold at S&H Hardware," HPP did not answer and instead raised objections as to the question's breadth, vagueness, and relevance, claiming the question would be better directed to S&H Hardware. *Id.* at 5-6 (answering interrogatory 10 by reference to its objections in response to interrogatories 7 and 8). And John Stanfield stated "[t]o the best of [his] knowledge" both DL Electronics and S&H Hardware were still authorized dealers in September 2017 at the time he sat for his deposition. Stanfield Dep. at 42. The facts HPP maintained business relationships with these authorized dealers, and year after year executed consistent sales, tend to establish HPP's business

activities in Philadelphia County were "so continuous and sufficient to be termed general or habitual." *Monaco*, 208 A.2d at 256.

This likely conclusion becomes unavoidable when we consider HPP's constant physical presence in Philadelphia County. HPP entered into contracts with DL Electronics and S&H Hardware to allow them to sell HPP products as authorized dealers. *See* Stanfield Dep. at 108. HPP admits that unlike the big-box retailers that handle their own distributions to multiple locations, its authorized dealers "typically do business at one specific location." Stanfield Suppl. Aff. at ¶16. Forming and maintaining these relationships with businesses that have physical locations specifically in Philadelphia County, and allowing them to stock, display, and sell HPP products in those physical locations on a day-to-day basis, HPP has regularly performed its business activities in the county. And as explained *supra*, even if HPP's products are collecting dust on the store shelves and HPP is making relatively little money out of Philadelphia County, its business activities still satisfy the quantity prong when we consider the regularity of those activities, as we must under our precedent. *See Monaco*, 208 A.2d at 256 ("It must be remembered that it is the word 'regularly' which we are construing[.]"). Obviously, HPP is at least **trying** to make sales in Philadelphia, regularly and continuously. As a matter of law, when a company maintains a constant physical presence in the forum county to perform acts that are "directly[] furthering, or essential to, [its] corporate objects[,]" even when it does so through an authorized dealer, its business activities are necessarily "so continuous and sufficient to be termed general or habitual." *Id.*[23]

---

[23] While we appreciate the dissenting opinion's concern this portion of our opinion "could be construed as holding that, as a matter of law, a corporation's mere presence in a county is sufficient to establish that venue is proper in that county[,]" we respectfully disagree "mere presence" would satisfy this standard. Dissenting Opinion at 4 n.2. Our holding is limited, speaking only to physical presences that are both **constant** (*i.e.*, regular) and which are **directly furthering, or essential to its corporate objects** (*i.e.*, (continued…)

Since the record is devoid of any evidence suggesting HPP's products were not regularly available for sale at the authorized dealers' stores, appellants have not met their "burden of proving that a change of venue is necessary[.]" *Purcell*, 579 A.2d at 1284.[24] Indeed, the consistent sales numbers, averments that DL Electronics and S&H Hardware were HPP's authorized dealers since 2014, and failure to articulate any interruption in the relationship between HPP and the authorized dealers between 2014 and 2016 suggests the opposite. We therefore affirm the holding of the Superior Court that the trial court abused its discretion when it found venue improper in Philadelphia County and transferred this case to Bucks County.[25]

where the presence is used to perform quality acts). This opinion provides a clarification of the quality-quantity analysis in these circumstances; it does not water it down to require mere presence only.

[24] Appellants urge the Court to adopt a burden-shifting framework articulated by the Superior Court in *Hausmann,* 271 A.3d at 493 ("once [the applicants] properly raise the issue of venue and provide 'some evidence . . . to dispel or rebut the plaintiff's' choice, the burden shifts back to the party asserting proper venue"). We need not address this argument. Even if we were to adopt such a burden-shifting framework, the appellants would have had to produce enough evidence "to dispel or rebut" the Hangeys' choice of forum before the burden would shift. *Id.* For the reasons provided throughout this opinion, appellants failed to do so.

[25] Due to appellants' failure to produce evidence that HPP's business activities with its authorized dealers in Philadelphia were irregular for purposes of the quantity prong, we respectfully disagree with the dissent's position that we should remand to the trial court. The trial court held "there is no question [HPP's] activities in Philadelphia satisfy the 'quality' prong . . . ." Trial Court Op. at 5 (explaining HPP "is in the business of distributing consumer outdoor products . . . to retailers, who in turn sell the products to consumers" and that "[t]he uncontroverted evidence shows [HPP] furthers this business objective by distributing products to two Philadelphia retailers"). Appellants challenged the quantity of those business activities only by reference to the small percentage of HPP's total nationwide sales made in Philadelphia County. *See, e.g.*, HPP's Prelim. Objections, 5/1/2017 at 5, 8; Trumbauer's Prelim. Objections, 5/1/2017 at 5, 8. Appellants point to no other evidence to prove those activities in Philadelphia County are not performed regularly, and as the dissent agrees, the percentage of national sales alone is not sufficient. *See* Dissenting Opinion at 1, 3. On the other hand, as outlined above, there is record evidence HPP is regularly conducting business through its authorized dealers. Thus, in deciding this case, we are not "assign[ing] weight to particular facts over others[.]" (continued…)

Because we agree the trial court abused its discretion by committing an error of law in its application of the quality-quantity test, we need not address the second issue on which we granted review (*i.e.*, whether the Superior Court failed to faithfully apply the abuse of discretion standard). We elaborate further only to dispel any notion the abuse of discretion standard precludes an appellate court from reversing a trial court based on a finding it misapplied the law. *See Zappala*, 909 A.2d at 1284 ("An abuse of discretion . . . occurs only **where the law is overridden or misapplied**, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record.") (emphasis added).

The fact the trial court identified the controlling precedent and applied what it believed to be an accurate interpretation of the quality-quantity test does not immunize its decision from correction, even under an abuse of discretion standard. Despite the good faith efforts of the trial court, its opinion conflicted with this Court's precedent, and it thus misapplied the law, which also constitutes an abuse of discretion. We further reject appellants' contention our opinion today and the Superior Court's opinion below bring about a "drastic" change in the law. Appellants' Reply Brief at 32. Our holding flows

---

*Id.* at 4. There is nothing to weigh in appellants' favor, so they could not have met their burden. Moreover, the mere fact this Court decides an ultimate issue (where appropriate in a particular case) does not "undermine[] the 'considerable discretion' we afford to our common pleas courts in this area[.]" *Id.* Indeed, in *Monaco*, *Canter*, and *Purcell*, this Court reached conclusions as to venue that were contrary to those reached by the trial courts. *See Monaco*, 208 A.2d at 255-56 (holding "the lower court erred when it found that venue was not proper in Philadelphia County" and finding the cab company's acts satisfied both the quality and quantity prongs); *Canter*, 231 A.2d at 143 ("We conclude that 1 to 2 percent of the total business was sufficient to satisfy the test set up in *Monaco* as to quantity. The court below erroneously sustained the additional defendant's preliminary objections."); *Purcell*, 579 A.2d at 1286-87 (reversing the lower courts to hold "venue was improper in Philadelphia County on the grounds that the hospital did not meet the quality-quantity test"). We need not waste judicial resources with a remand where the law compels a particular outcome.

logically from our well-established precedent. *See, e.g.*, *Canter*, 231 A.2d at 142-43; *Monaco*, 208 A.2d at 256; *Shambe*, 135 A. at 757-58.

## V. Conclusion

Accordingly, we affirm the Superior Court's holding that the trial court improperly transferred venue from Philadelphia County to Bucks County.

Chief Justice Todd and Justices Donohue, Wecht and Mundy join the opinion.

Justice Brobson files a dissenting opinion.